b

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| LISA LANIER,<br>Appellant | CIVIL DOCKET NO. 1:22-CV-05812 |
| VERSUS | DISTRICT JUDGE DOUGHTY |
| COMMISSIONER OF SOCIAL<br>SECURITY,<br>Appellee | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Appellant Lisa Lanier ("Lanier") appeals the final decision of the Commissioner of Social Security ("the Commissioner") denying her claim for disability benefits.

Because the ALJ did not use the correct legal analyses and procedures for considering Lanier's failure to follow prescribed treatment and her DAA, and erred in failing to consider whether Lanier had good cause for failing to follow prescribed treatment, Lanier's appeal should be GRANTED, the final decision of the Commissioner should be VACATED, and the case should be REMANDED.

## I.  Background

### A.    Procedural Background

Lanier filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on April 23, 2020, alleging a disability onset

date of January 24, 2019[1] (ECF No. 13-1 at 259, 261) due to scoliosis, bipolar disorder, "leg," "back," hearing voices, possible hallucinations, and "behavior." ECF No. 13-1 at 321. Those applications were denied by the Social Security Administration ("SSA"), both initially and on reconsideration. ECF No. 13-1 at 146, 151, 156, 161, 169, 172, 177,182.

A *de novo* hearing was held before an administrative law judge ("ALJ") on December 15, 2021, at which Lanier appeared with a vocational expert ("VE"). ECF No. 13-1 at 40-41.

The ALJ found that Lanier met the disability insured status requirements through December 31, 2021. ECF No. 13-1 at 20. The ALJ held that Lanier had severe impairments of bipolar disorder, schizoaffective disorder, generalized anxiety disorder, lumbar degenerative disc disease, obesity, hypertension, personality disorder, polysubstance use disorder, and COPD (ECF No. 13-1 at 20). Lanier also has the residual functional capacity to perform light work with limitations: she can only occasionally stoop; she must avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; she must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; she can do only simple, routine, repetitive tasks; she can have only occasional changes in the work setting; and she can have only superficial interaction with the public and

---

[1] Lanier asserted a disability onset date of June 10, 2018 in her applications, but amended that date to January 24, 2019 at her administrative hearing. ECF No. 13-1 at 17, 48.

coworkers.  ECF No. 13-1 at 23.  The ALJ further found that Lanier: is unable to perform any of her past relevant work; is closely approaching advanced age; and has at least a high school education.  ECF No. 13-1 at 30.  Lanier can perform a limited range of light work, such as: price marker (DOT 209.587, unskilled, 129,000 jobs nationally); housekeeper (DOT 323.687-014, unskilled, 220,000 jobs nationally); and mail sorter (DOT 222.687-022, unskilled, 104,000 jobs nationally). ECF No. 13-1 at 31.  The ALJ concluded that Lanier was not disabled, as defined in the Social Security Act, at any time from January 24, 2019 through the date of the decision on April 6, 2022.  ECF No. 13-1 at 32.

Lanier requested a review of the ALJ's decision, but the Appeals Council declined to review it (ECF No. 13-1 at 7).  Thus, the ALJ's decision became the final decision of the Commissioner.

Lanier then filed this appeal for judicial review of the Commissioner's final decision (ECF No. 15), raising the following issues:

> The ALJ erred by conducting improper analyses of Lanier's alleged noncompliance with prescribed treatment and substance abuse, and failing to resolve material inconsistencies in his evaluation of the state agency medical consultants' mental health opinion.

The Commissioner opposes Lanier's appeal.  ECF No. 18.

B.    <u>Medical Records</u>

In September 2014, Lanier's EMG nerve conduction studies indicated the presence of L4 nerve root irritation versus radiculitis on the right side.  ECF No. 13-1 at 391-92.

In July 2014, Lanier was suffering from nausea, but an ultrasound of her right upper abdominal quadrant was normal.  ECF No. 13-1 at 401.  In April 2015, Lanier underwent an esophagogastroduodenoscopy due to GERD (for one year), heartburn, epigastric abdominal pain (one year), nausea, and vomiting.  ECF No. 13-1 at 287, 428.  Lanier had mild gastritis in the antrum.  ECF No. 13-1 at 387.  Sleeping upright resolved the vomiting.  ECF No. 13-1 at 418.  Lanier was 5'3" tall and weighed 171 pounds.  ECF No. 13-1 at 430.

Also in April 2015, x-rays of Lanier's spine showed: L5-S1 spondylolisthesis grade 1 with probable associated L5 spondylolysis; mild wedging deformity of the L1 vertebral body that appeared chronic; and a large Schmorl's node in the superior endplate of L1.  ECF No. 13-1 at 398.  X-rays of her chest were normal.  ECF No. 13-1 at 399.

In October 2015, x-rays of Lanier's cervical spine showed degenerative changes and straightening of the cervical lordosis.  ECF No. 13-1 at 403.  X-rays of her spine showed mild chronic compression deformity of L1 and spondylolisthesis at L5-S1.  ECF No. 13-1 at 404.

In September 2016, Lanier was evaluated by Dr. Seth Billiodeaux for constant lower back pain and radiculopathy in the right lower extremity that worsened with brisk activity, walking sitting, laying down, exercise, bending, and prolonged standing to sitting. ECF No. 13-1 at 434. Lanier's back pain interfered with and greatly limited all activities of daily living, sleep, work, and social functions. ECF No. 13-1 at 434. Lanier was taking suboxone, pantoprazole, ranitidine HCl, and Klonopin. ECF No. 13-1 at 434. Lanier was 5'4" and 189 pounds, and her blood pressure was 108/75. ECF No. 13-1 at 435. An MRI showed 4-5 mm left side disc protrusion at L4/5 impinging on the left L5 nerve root, bilateral pars defect at L5/S1, and Grade 1 spondylolisthesis. ECF No. 13-1 at 434. Her lower extremity muscle strength was normal bilaterally. ECF No. 13-1 at 435. Her gait was rigid and she had positive straight leg raises bilaterally. ECF No. 13-1 at 435. Dr. Billiodeaux diagnosed low back pain, congenital spondylolisthesis, and radiculopathy-lumbosacral region. ECF No. 13-1 at 436. He prescribed suboxone and gave her a lumbar epidural steroid injection (ECF No. 13-1 at 390).

In December 2016, x-rays showed: L5 spondylolysis and grade 1 L5-S1 spondylolisthesis; moderate degree anterior wedging of L1; and mild levoscoliosis. ECF No. 13-1 at 406.

In April 2017, Lanier was 5'3" and weighed 183 pounds. ECF No. 13-1 at 1001. She had a full range of motion in her back, spine, and pelvis. ECF No. 13-1 at 1002. Her gait was normal. ECF no. 13-1 at 1002. She was oriented; her executive

processing was generally appropriate and intact; her judgment and insight were generally appropriate; her short and long term memory were intact; and her mood and affect were normal and appropriate. ECF No. 13-1 at 1002. She was diagnosed with: essential hypertension; anxiety disorder; radiculopathy – lumbosacral region; dorsalgia – low back pain; and mononeuropathies of the upper limb/carpal tunnel syndrome right upper limb. ECF No. 13-1 at 1003. Lanier was given a decadron shot in her left hip. ECF No. 13-1 at 1002. She was prescribed amitriptyline, hydroxyzine, Levaquin, nabumetone, Protonix, Robaxin, and Zantac. ECF No. 13-1 at 1003.

From July 7-19, 2017, Lanier was hospitalized for a psychiatric crisis. ECF No. 13-1 at 448-49, 712-16. Her family reported that she had gone through a 90-day supply of Klonopin in 4 days. ECF No. 13-1 at 739. Lanier tested positive for benzodiazepine and opiates. ECF No. 13-1 at 733. Her mental status exam showed her judgment, insight, attention, and memory were severely impaired, and she was having auditory hallucinations. ECF No. 13-1 at 452, 717, 739-40. Lanier was found to be violent, dangerous to herself and others, gravely disabled, and unwilling and unable to seek voluntary admission. ECF No. 13-1 at 453. She was admitted for acute psychosis with delusions, hallucinations, paranoia, hypokalemia, and violent behavior. ECF No. 13-1 at 721. During her stay, she frequently engaged in drug-seeking behavior, particularly seeking Xanax and pain pills. ECF No. 13-1 at 740. Lanier was discharged with prescriptions for Sertraline, Oxcarbazepine, Trazadone,

6

Olanzapine, and hydroxyzine, and ordered to discontinue Geodon, Relafen, Seroquel, and Elavil.  ECF No. 13-1 at 455-56, 741.

From September 18-21, 2017, Lanier was again hospitalized for acute benzo-withdrawal from taking Klonopin, a benzodiazepine, daily for several years.  ECF No. 13-1 at 464.  Lanier was discharged with prescriptions for Nabumetone, Protonix, Trileptal, Zoloft, Zyprexa, and Ranitidine.  ECF No. 13-1 at 464.

In November 2017, Lanier was treated for an accidental overdose of Neurontin.  ECF No. 13-1 at 510.  Lanier reported that she had been on a three-month methamphetamine binge and was trying to stop.  ECF No. 13-1 at 510.  Lanier weighed 150 pounds and her blood pressure was 135/80.  ECF No. 13-1 at 510-11.

In February 2018, Lanier was treated for depression, suicidal thoughts, anxiety, auditory hallucinations, confusion, and agitation.  ECF No. 13-1 at 467.  Lanier reported she had been homeless for three weeks and was not taking her medications.  ECF No. 13-1 at 467.  Lanier was 5'3" tall and weighed 119 pounds.  ECF No. 13-1 at 467.  Lanier's diagnosis on discharge was chronic bipolar disorder and chronic substance abuse.  ECF No. 13-1 at 471.

In May 2018, Lanier was treated for back pain and hyperlipidemia.  ECF No. 13-1 at 664.  She was prescribed Divalproex, nicotine patches, cyclobenzaprine, hydroxyzine, nabumetone, Risperdal, and Seroquel.  ECF No. 13-1 at 682.  Also in May, Lanier was treated for bipolar disorder and "substance dependence with abuse with mood disorder."  ECF No. 13-1 at 687, 689.  She was cutting herself and having

7

hallucinations.  ECF No. 13-1 at 688.  She reported that she was schizophrenic, so she felt paranoid.  ECF No. 13-1 at 689.  She also reported she hears voices "when her anxiety is bad," and that Xanax makes the voices go away.  ECF No. 13-1 at 690.  She tested positive for benzodiazepine and marijuana.  ECF No. 13-1 at 674.  Lanier was prescribed Depakote, Risperdal, Vistaril, and Seroquel.  ECF No. 13-1 at 690.

Lanier was hospitalized again from July 1 to July 24, 2018 for drug-induced psychosis, severe amphetamine use disorder, schizophrenia, and chronic pain.  ECF No. 13-1 at 474.  She was receiving SSI and was homeless.  ECF No. 13-1 at 474.  She was suicidal, bizarre, upset, confused, disoriented, delirious, required 24-hour supervision, and speaking garbled nonsense.  ECF No. 13-1 at 474.  Lanier finally began to speak clearly and do better on July 20.  ECF No. 13-1 at 475.  Lanier was diagnosed with schizophrenia, severe opioid use disorder, and severe amphetamine use disorder.  ECF No. 13-1 at 475-76.  She was discharged with prescriptions for Mobic, Trazodone, Cogentin, Depakote, Haldol, Synthroid, and Seroquel.  ECF No. 13-1 at 475-76.

In September 2018, Lanier was treated in the emergency room for lower back pain radiating down both legs for three days.  ECF No. 13-1 at 519.  She was diagnosed with grief-reaction sciatica (due to losing her cousin).  ECF No. 13-1 at 525.  She was treated with Toradol and Norflex, and prescribed Cataflam, Zanaflex, and Geodon on discharge.  ECF No. 13-1 at 520, 525, 527.

Two days later, Lanier returned to the ER complaining of anxiety and back pain.  ECF No. 13-1 at 528, 614-17.  Her blood pressure was 149/108.

Lanier had again stopped taking all of her medications, and reported that the Buspar and Seroquel made her "crazy." ECF No. 13-1 at 528. She reported that she could not sleep or keep still. ECF No. 13-1 at 541. She was diagnosed with generalized anxiety disorder, bipolar-manic disorder, insomnia, and low back pain. ECF NO. 13-1 at 552. She tested negative for illegal drugs and opiates. ECF No. 13-1 at 620. Lanier was discharged with prescriptions for Zyprexa and Vistaril, and sent to a rehabilitation facility. ECF No. 13-1 at 554, 616-17, 636-37.

In October 2018, Lanier was seen in a follow-up visit for her bipolar disorder, opiate abuse, anxiety, and insomnia. ECF No. 13-1 at 578. It was noted that Lanier had done well on suboxone therapy for 10 years. ECF No. 13-1 at 578. After Lanier was off of suboxone for a year, she began using drugs again and having worsening opiate cravings and racing thoughts. ECF No. 13-1 at 578. She reported a decrease in her anxiety when she was on suboxone. ECF No. 13-1 at 578. She was still anxious and depressed, but not easily distracted. ECF No. 13-1 at 579. Lanier was diagnosed with uncontrolled bipolar disorder, current episode of severe depression with psychotic features, uncontrolled generalized anxiety disorder, uncontrolled insomnia, and uncontrolled opioid dependence with opioid-induced psychotic disorder and delusions. ECF No. 13-1 at 579-80. She was prescribed Depakote, Latuda, Buspirone, and Trazodone. ECF No. 13-1 at 579.

In February 2019, Lanier had a follow-up mental health visit for medication management. ECF No. 13-1 at 569. Lanier had not been compliant with her

medication, and her psychosis, hallucinations, and anxiety were worsening. ECF No. 13-1 at 569. Her mood was depressed and anxious, her affect was abnormal and flat, and her thought processes and content were impaired. ECF No. 13-1 at 570. Lanier was prescribed Trileptal, Depakote, Latuda, Buspar, Vistaril, Doxepin, and sub571.xone. ECF No. 13-1 at 571. Two weeks later, Lanier 's affect was still flat, and her thought content was still impaired, but her thought processes were no longer impaired. ECF No. 567 at 1208.

In May 2019, Lanier received emergency treatment for a suicide attempt. ECF No. 13-1 at 986. She ingested multiple drugs (Seroquel and hydroxyzine pills). She was homeless and complained she was hearing voices. Lanier knew the voices were not real but said they would not stop long enough for her to rest. ECF No. 13-1 at 986. She was diagnosed with: intentional overdose; schizophrenia; bipolar disorder; and recurrent severe major depressive disorder with psychosis. ECF No. 13-1 at 989.

In June 2019, Lanier was treated for her schizoaffective disorder, anxiety, opioid dependence, and insomnia. ECF No. 13-1 at 558. She was found to be highly paranoid, with persecutory delusions, confused, agitated, having a conversation with herself, anxious, argumentative, and unable to differentiate whether she was in a state of psychosis or triggered by substances. ECF No. 13-1 at 558, 835, 964. She tested positive for amphetamines. ECF No. 13-1 at 854. She weighed 148 pounds and her blood pressure was 148/104. ECF No. 13-1 at 558. Her executive functions were decreased, and her judgment, thought processes, and thought content were

10

impaired.  ECF No. 13-1 at 559.  Lanier was hospitalized from June 24 to July 1, 2019, for acute psychosis, high risk and gravely disabled.  ECF No. 13-1 at 559, 590, 839, 849.  She was also found to be hypotensive.  ECF Nol 13-1 at 838.  She was discharged with suboxone, lorazepam, and propranolol.  ECF No. 13-1 at 600.  Her condition was fair and her prognosis was guarded.  ECF No. 13-1 at 840.

In July 2019, Lanier again went to the ER reporting suicidal thoughts and auditory hallucinations (voices telling her to kill herself), moderate depression, and recent narcotics abuse.  ECF No. 13-1 at 947.  Lanier' son had stolen her medications, and she was homeless.  ECF No. 13-1 at 947.  Her blood pressure was 116/90 (pre-hypertensive).  ECF No. 13-1 at 947, 952.  Her mood, affect, speech, insight, and judgment appeared to be normal.  ECF No. 13-1 at 947.

In October 2019, Lanier admitted herself for treatment of psychosis and suicidal ideations, active hallucinations, and worsening depression with agitation.  ECF No. 13-1 at 813, 828.  She was diagnosed with acute psychosis with hallucinations and major depressive disorder with suicidal ideation.  ECF No. 13-1 at 939.  She was treated with Haldol, Seroquel, and her home medications, and discharged in fair condition with a guarded prognosis, with Doxepin, Gabapentin, Haldol, Vistaril, Nicotine, and Seroquel.  ECF No. 13-1 at 813, 916.

X-rays of Lanier's lumbar spine in December 2019 showed first degree spondylolisthesis of L5 on S1 and bilateral parts defects at L5.  ECF No. 13-1 at 811, 914, 1102; No. 13-2 at 73.

11

Lanier was hospitalized from December 13-27, 2019. ECF No. 13-1 at 1053. She complained of suicidal thoughts and auditory hallucinations (telling her to harm herself for several days). ECF No. 13-1 at 759, 766, 862. Her blood pressure was 146/92. ECF No. 13-1 at 759. Lanier was negative for illicit drugs. ECF No. 13-1 at 760, 767, 863. She had been noncompliant with her medication for several months. ECF No. 13-1 at 766. She was diagnosed with psychosis with hallucinations. ECF No. 13-2 at 25. She was discharged to an inpatient substance abuse facility with prescriptions for Buspar, Cymbalta, Gabapentin, Vistaril, Latuda, Inderal, Requip, Trazadone, and Zanaflex. ECF No. 13-1 at 767, 1054; No. 13-2 at 28-29, 54.

In March 2020, Lanier reported she was in a sober living arrangement. She said she was very anxious and needed benzodiazepines. ECF No. 13-1 at 1106. Instead, she was prescribed therapy, and her Cymbalta was increased. ECF No. 13-1 at 1106-07. Lanier's mood was "ok" with full affect; her thoughts were linear and goal-directed; she did not have hallucinations; her insight, judgment, and impulse control were fair; and her memory was intact. ECF No. 13-1 at 1107.

In May 2020, Lanier's anxiety and panic attacks were high, and she tested positive for buprenorphine (a synthetic opioid). ECF No. 12-1 at 1111-12. In June 2020, she asked for ADHD medication and tested positive for fentanyl. ECF No. 13-1 at 1114. Lanier insisted her roommate was using fentanyl, but she was not, and believed she accidentally touched it when cleaning their room. ECF NO. 13-1 at 1114.

In August 2020, Lanier reported that her roommate, who had been using fentanyl, had moved out.   ECF No. 13-1 at 1122.  Since then her own urine screens had been negative.   ECF No. 13-1 at 1122.   She reported compliance with her prescribed medications and weight loss.  ECF No. 13-1 at 1125.

However, Lanier weighed 200 pounds and her blood pressure was 142/88. ECF No. 13-1 at 1138.   She was diagnosed with morbid obesity, essential hypertension, anxiety, GERD, pain in her right knee, COPD, and opioid dependence in remission.   ECF No. 13-1 at 1138.   After a few weeks, Lanier reported she was following a low carbohydrate diet and walking 3 to 4 times per week.   She had lost 4 pounds, but then she noticed swelling in her lower extremities.   ECF No. 13-1 at 1136. A month later, she weighed 197 pounds and reported that she was dieting, walking for 20 minutes twice per week, and had stopped smoking.   ECF No. 13-1 at 1133.   Lanier was referred for gastric sleeve surgery.  ECF No. 13-1 at 1136.

In October 2020, Lanier reported her anxiety and panic attacks were better. ECF No. 13-1 at 1151.   In November, she reported that her life was going "really good," and she had no psychiatric symptoms.  ECF No. 13-1 at 1160-61.

In November 2020, Lanier weighed 190 pounds, and her blood pressure was 119/74.   ECF No. 13-2 at 87.   She was also diagnosed with COPD (chronic obstructive pulmonary disease).   She reported that she had stopped smoking and was prescribed an inhaler.   ECF No. 13-1 at 88.

13

In February 2021, Lanier said her opioid cravings were worse and requested clonidine, which was prescribed. ECF No. 13-1 at 1163, 1165. She was not having any psychiatric symptoms. ECF No. 13-1 at 1163-64. In March 2021, Lanier's opioid cravings were controlled again. ECF No. 13-1 at 1166. In April 2021, Lanier was about to start a new job. ECF No. 13-1 at 1169. In July 2021, Lanier was working. ECF No. 13-1 at 1184.

In March 2021, Lanier was treated for back pain. ECF No. 13-2 at 82. She weighed 216 pounds. ECF No. 13-2 at 82. Lanier was diagnosed with GERD and acute right-sided low back pain with right-sided sciatica. ECF No. 13-2 at 82. She requested a referral for gastric sleeve surgery, but was advised that referral requires participation in a six-month physician-supervised weight loss program, and was instructed to keep a food and activity diary. ECF No. 13-2 at 83. Lanier also requested, and was given, a referral for physical therapy to treat her low back pain, because it had helped significantly in the past. ECF No. 13-2 at 83.

In April 2021, Lanier (then 50 years old) was treated for weight loss. ECF No. 13-2 at 79. She was 5'2" tall and weighed 226 pounds, and her od pressure was 170/119. ECF No. 13-2 at 79. Lanier was prescribed hydrocholorothiazide for her hypertension, and told to count calories and keep a food and activity log. ECF No. 13-2 at 79-80.

In May 2021, Dr. James Pinkston, Ph.D., reviewed Lanier's medical records and made a mental residual functional capacity assessment. Dr. Pinkston found that

14

Lanier is moderately limited in her ability to interact appropriately with the general public, and moderately limited in her ability to respond appropriately to changes in the work setting. ECF No. 13-1 at 128-29. Dr. Pinkston stated that Lanier would function best in a standardized work environment with minimal variation. ECF No. 13-1 at 129.

Dr. Pinkston also filled out a psychiatric review technique form for Lanier, finding she has severe depressive, bipolar and related disorders; severe anxiety and obsessive-compulsive disorders; severe obesity; severe schizophrenia spectrum and other psychotic disorders; and severe substance addiction disorders. ECF No. 13-1 at 133-34. Dr. Pinkston found that Lanier had: a mild limitation in her ability to understand, remember, or apply information; a moderate limitation in her ability to interact with others; a mild limitation in her ability to concentrate, persist, or maintain pace; and a moderate limitation in her ability to adapt or manage herself. ECF No. 13-1 at 134. She was also diagnosed with drug addiction or alcoholism ("DAA"). ECF No. 13-1 at 135. Overall Dr. Pinkston concluded that Lanier had mild to moderate impairment in global and work-related functioning. ECF No. 13-1 at 135.

From October 2021 through, Lanier was seen and prescribed medication refills at Oschner/LSU Health Shreveport. ECF No. 13-2 at 99. In October 2021, she weighed 192 pounds and her blood pressure was 121/79. ECF No. 13-2 at 99. She was tapering off of suboxone and had recently been in rehab. ECF No. 13-2 at 142.

15

She was also successfully taking multiple psychiatric medications; her hypertension was controlled; and her sciatica was doing well.  ECF NO. 13-2 at 142.

In June 2021, Dr. Paul Wilson, a family doctor, reviewed Lanier's medical records and made a physical residual functional capacity assessment.  ECF No. 13-1 at 127.  Dr. Wilson found that Lanier can: occasionally lift/carry up to 50 pounds; frequently lift/carry up to 25 pounds; do unlimited pushing and/or pulling with her upper and lower extremities; stand/walk up to 6 hours in an 8-hour day; sit up to 6 hours in an 8-hour day; and has no postural, manipulative, visual, communicative, or environmental non-exertional limitations.  ECF No. 13-1 at 127.

In September 2021, Lanier was still in sober living, had lost her job and was looking for a new one, but reported that she was in relapse.  ECF No. 13-1 at 1173-74.  At the end of October 2021, Lanier completed her two-month residential inpatient treatment for substance abuse and co-occurring mental health disorders.  ECF No. 13-2 at 8-20.

In December 2021, Lanier underwent a flexible endoscopic evaluation of swallowing, due to her uncontrolled reflux (laryngopharyngeal reflux).  She was found to swallow normally.  ECF No. 13-2 at 159, 185.  A laryngostroboscopy showed her mucosal wave was normal.  ECF No. 13-2 at 159.

### C.    2021 Administrative Hearing

Lanier appeared at the December 2021 administrative hearing with her attorney and a vocational expert ("VE").  ECF No. 13-1 at 4.

16

Lanier testified that she is right-handed and completed an associate degree in accounting and office systems technology. ECF No. 13-1 at 49-50. She has never made a worker's compensation claim but drew unemployment benefits during the COVID-19 pandemic. ECF No. 13-1 at 50. She lived in a homeless shelter and participated in a one-year life recovery program ("New Beginnings"). ECF No. 13-1 at 50. Lanier committed to stay in the program for one year, in exchange for which she was given food, shelter, and counseling. ECF Nos. 13-1 at 50.

Lanier worked as a dispatcher for Interface Security for about three months in 2021, but ultimately resigned. ECF No. 13-1 at 51. Lanier testified that she had not been able to follow "that many instructions," even with her medications. ECF No. 13-1 at 52. When Lanier left that job, she went almost immediately into a behavioral health hospital. ECF No. 13-1 at 52.

In 2016, Lanier tried to work in medical coding and billing. ECF No. 13-1 at 53. She testified that, at that time, she was having auditory hallucinations. ECF No. 13-1 at 53. Between listening to her supervisor's instructions, hearing voices, and the noise from the lobby, Lanier was unable to focus. ECF No. 13-1 at 53. She testified that her health was declining at that time. ECF No. 13-1 at 53.

In 2015, Lanier worked as a receptionist for Barrett Consulting, and then as an administrative assistant for the company that bought Barrett Consulting. ECF No. 13-1 at 53-54. Lanier worked part-time (28 hours per week) in 2012-2014 for

17

PWK Timberland (an oil and gas company) as an administrative/office assistant (data entry as well as general office work), while she attended school.  ECF No. 13-1 at 55-57.  She also attended notary classes.  ECF No. 13-1 at 57.

Lanier testified that, since 2016, her condition has worsened due to losing her father, "three mental breakdowns," "being schizophrenic," being bipolar," instability, self-consciousness, talking to herself, having outbursts and panicking, and not remembering things that she does.  ECF No. 13-1 at 58.  Lanier testified that the voices get so loud that she screams to someone who is not there.  ECF No. 13-1 at 58.  She also hears her children "being tortured."  ECF No. 13-1 at 58.  Lanier said the voices make it difficult for her to hear and follow directions.  ECF No. 13-1 at 58.

Lanier also testified that her medications have side effects.  ECF No. 13-1 at 58.  All of her medications make her tired, but she "can't sleep."  ECF No. 13-1 at 59.  Lanier recently began taking medications for tics she has recently developed.  ECF No. 13-1 at 59.  She has nightmares, agitation, and dry mouth, which she also takes medications for.  ECF No. 13-1 at 59.  Lanier testified that some of her medications seem to make her "more psychotic," while others help her  ECF No. 13-1 at 59.  Lanier stated that she often lays down and rests during the day, due to sleepiness from her medications.  ECF No. 13-1 at 60.

Lanier testified that she cannot concentrate or retain information due to the voices in her head.  Even written instructions do not really help.  Lanier testified that she cannot deal with more than two-step instructions.  ECF No. 13-1 at 59-60.

18

Lanier testified that she does not see well and has glasses, but that they are broken. ECF No. 13-1 at 60. She tries to get along with other people. ECF No. 13-1 at 60. At the shelter, she washes clothes for "a day," then spends the "other days" in her recovery classes. ECF No. 13-1 at 61. Because she is in the program, she does not have a lot of time to do chores. ECF No. 13-1 at 60.

Lanier has spondylosis and degenerative arthritis in her back, as well as right-side sciatica for which she takes medication. ECF No. 13-1 at 60. Lanier explained that she had a fracture in her back that did not heal properly. ECF No. 13-1 at 60. She can sit for up to 30 minutes at a time before she has to get up and walk around for 10 to 15 minutes. ECF No. 13-1 at 61. She can stand up for about 15 minutes. ECF No. 13-1 at 61. She cannot lift because of her back problems. ECF No. 13-1 at 61. Having to lift parts and packages weighing 20 to 25 pounds was one of the reasons she could no longer work at the security company. Her back "went out" while she was there because she was lifting too much. ECF No. 13-1 at 62. Lanier did testify, however, that she could lift and pour a gallon of water or milk. ECF No. 13-1 at 62.

Lanier became dependent on opioids years ago, so she was prescribed Suboxone. However, she used it for about nine years, during which she went to college. ECF No. 13-1 at 63. Lanier said she did not want to take Suboxone for the rest of her life because it is a narcotic. Through rehabilitation and the New Beginnings program, Lanier eventually tapered off of Suboxone with no side effects. ECF No. 13-1 at 64.

19

Lanier also has COPD. She has quit smoking but still has breathing problems. ECF No. 13-1 at 64. Lanier testified that she has an inhaler for her COPD, but has not had to use it since she quit smoking. ECF No. 13-1 at 65. However, she still "feels like something is sitting on her chest," so her doctor is going to refer her to a pulmonologist. ECF No. 13-1 at 65.

Lanier is also seeing a psychiatrist, who diagnosed her with schizoaffective disorder, bipolar disorder, anxiety disorder, and insomnia. ECF No. 13-1 at 70.

Lanier testified that she has one son and one daughter. She is not allowed to have visitors during the program, and both of her children are addicts, so she does not see them. ECF No. 13-1 at 64. Lanier said she no longer wants to abuse drugs because she is scared that, due to her mental instability, if she continues to do so she may "lose her mind" and never recover. ECF No. 13-1 at 66.

The VE testified that Lanier's job as a "personal assistant," or secretary, is DOT 201.362-030, sedentary, and SVP 6. Lanier's job as a receptionist is DOT 237.367-038, sedentary, and SVP 4.

The ALJ posed a hypothetical involving a person of Lanier's age (48), education, and work experience, and who is limited to: only occasional stooping; has to avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; can do only simple, routine, repetitive tasks; can have only occasional changes in the work setting; and can have

20

only superficial interaction with the public and coworkers.  The VE testified that such an individual could not perform her past relevant work.  However, she could work as a: price marker (DOT 209.587-034, light work, SVP 2, 129,000 jobs nationally);  housekeeper (DOT 323.687-014; light work; SVP 2; 220,000 jobs nationally); or mail sorter (DOT 222.687-022; light work; SVP 2; 104,000 jobs nationally).  ECF No. 13-1 at 69.  The VE testified that, if a worker is off-task 15% or more of the time, or has two or more absences per month, she would not be able to maintain employment. ECF No. 13-1 at 69.

### D.    ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Lanier (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, a claimant bears the initial burden of showing disability. This means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this burden is satisfied, the Commissioner must then establish that the claimant is capable of performing work in the national economy. *See Greenspan*, 38 F.3d at 237.

In this case, the ALJ found that Lanier has not engaged in substantial gainful activity since January 24, 2019; that she has disability insured status through December 31, 2021; and that she has severe impairments of "bipolar disorder, schizoaffective disorder, generalized anxiety disorder, lumbar degenerative disc disease, obesity, hypertension, personality disorder, polysubstance disorder, and COPD," but that she does not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1. ECF No. 13-1 at 20.

Lanier was relatively young (47 years old) on her disability onset date, but was, in effect, "closely approaching advanced age" soon after. ECF No. 13-1 at 30. She has at least a high school education. ECF No. 13-1 at 30. At Step 5 of the sequential process, the ALJ further found that Lanier has the residual functional capacity to perform only a limited range of light work, and is unable to perform any of her past relevant work. ECF No. 13-1 at 31. However, Lanier is able to perform light, unskilled work that exists in significant numbers in the national economy, such as: price marker (DOT 209/587-034; 129,000 jobs nationally); housekeeper (DOT 323.687-014; 220,000 jobs nationally); and mail

sorter (DOT 222.687-022; 104,000 jobs nationally).  ECF No. 13-1 at 31  The ALJ

concluded that Lanier was not disabled at any time from January 24, 2019 through

April 6, 2022.  ECF No. 13-1 at 31.  II.

## II.    Law and Analysis

### A.    Scope of Review

A court's review of social security disability claims is "exceedingly deferential

and limited to two inquiries: whether substantial evidence supports the ALJ's

decision, and whether the ALJ applied the proper legal standards when evaluating

the evidence." *Boone v. O'Malley*, 2023 WL 9018388, at *1 (5th Cir. 2023) (quoting

*Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)).  "When substantial evidence

supports the ALJ's findings, these findings 'shall be conclusive" and must be

affirmed." *Daigle v. Kijakazi*, 2023 WL 4501865, at *1 (5th Cir. 2023) (citing 42

U.S.C. § 405(g).

For the evidence to be substantial, however, it must be "more than a scintilla

and less than a preponderance," and "of such relevance that a reasonable mind would

accept it as adequate to support a conclusion." *Falco v. Shalala*, 27 F.3d 160, 162

(5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also*

*Biestek v. Berryhill,* 587 U.S. 97, 103 (2019).  "[T]he substantial evidence test does

not involve a simple search of the record for isolated bits of evidence which support

the [Commissioner's] decision.  [The Court] must consider the record as a whole, and

the substantiality of the evidence must take into account whatever in the record

23

fairly detracts from its weight." *See Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986). A court "may not retry factual issues, reweigh evidence, or substitute [its] judgment for that of the factfinder." *Dellolio v. Heckler,* 705 F.2d 123, 125 (5th Cir. 1983); *see also Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court. *See Allen v. Schweiker,* 642 F.2d 799, 801 (5th Cir. 1981); *see also Daigle v. Kijakazi*, 2023 WL 4501865, at *1. A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

### B. <u>The ALJ did not employ the correct procedures for considering Lanier's failure to follow prescribed treatment.</u>

Lanier contends the ALJ erred by: (1) conducting improper analyses of Lanier's alleged noncompliance with prescribed treatment and substance abuse; and (2) failing to resolve material inconsistencies in the state agency medical consultants' mental health opinion. The Court agrees, and also finds the ALJ failed to properly consider Lanier's ability to maintain employment.

"In some cases, a finding of noncompliance with treatment or of substance abuse precludes a finding of disability." *Lindsey v. Astrue*, 2011 WL 817173, at *8

(N.D. Tex. 2011).[2]  SSR 18-3p, Failure to Follow Prescribed Treatment, 2018 WL 4945641, at *1 (Oct. 2, 2018),[3]  states that the failure to follow prescribed treatment policy may apply in a claim when:

_____

[2] The ALJ also repeatedly mentioned Lanier's polysubstance abuse but failed to mention or apply SSR 13-2p in Lanier's case.  SSR 13-2p, Evaluating Cases Involving Drug Addiction and Alcoholism (DAA), 2013 WL 621536 at *4 (Feb. 20, 2013), provides:

    a.  Sections 223(d)(2)(C) and 1614(a)(3)(J) of the Social Security Act (Act) provide that a claimant "shall not be considered to be disabled * * * if alcoholism or drug addiction would * * * be a contributing factor material to the Commissioner's determination that the individual is disabled." When we adjudicate a claim for disability insurance benefits (DIB), Supplemental Security Income (SSI) payments based on disability, or concurrent disability claims include evidence from acceptable medical sources as defined in 20 CFR 404.1513 and 20 CFR 416.913 establishing that DAA is a medically determinable impairment(s) (MDI) *and* we determine that a claimant is disabled considering all of the claimant's medically determinable impairments (MDIs), we must then determine whether the claimant would continue to be disabled if he or she stopped using drugs or alcohol; that is, we will determine whether DAA is *"material"* to the finding that the claimant is disabled. 20 CFR 404.1535 and 416.935. See Question 2 for additional information.

*See also Bustamante v. Massanari,* 262 F.3d 949, 955 (9th Cir. 2001) (citing *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001)) ("If the ALJ finds that the claimant is disabled and there is medical evidence of his or her drug addiction or alcoholism, then the ALJ should proceed under §§ 404.1535 or 416.935 to determine if the claimant would still be found disabled if he or she stopped using alcohol or drugs."); *Hopkins v. Commissioner of Social Security,* 2023 WL 8828676, at *2 (M.D. La. 2023); *Vanacor v. Kijakazi,* 2023 WL 3939783, at *8-*9 (E.D. La. 2023), *report and recommendation adopted,* 2023 WL 3935029 (E.D. La. 2023).  "Pursuant to SSR 13-2p, periods of abstinence may be considered evidence of whether DAA is material in cases involving co-occurring mental disorders, so long as the 'claimant is abstinent long enough to allow the acute effects of drugs or alcohol abuse to abate.' " *Hopkins,* 2023 WL 8828676, at *2 (citing *Vanacor,* 2023 WL 3939783, at *10).  To make such a determination, S.S.R. 13-2p(5)(a) provides a 6-step DAA (drug addiction or alcoholism) evaluation process.

[3] SSR 18-3p rescinded and replaced SSR 82-59 on October 29, 2018.  *See* SSR 18-3p, 2018 WL 4945641, at *1.

25

1.  the individual is otherwise entitled to disability;

2.  there is evidence that an individual's own medical sources prescribed treatment for the medically determinable impairment(s) upon which the disability finding is based; and

3.  there is evidence that the individual did not follow the prescribed treatment.

Thus, an ALJ may consider a claimant's noncompliance, but only *after* finding a claimant is disabled pursuant to the five-step analysis. *See* S.S.R. 18-3p(B); POMS DI 23010.007(B)(2) (When to Apply Failure to Follow Prescribed Treatment Policy).[4] If the policy applies, a determination regarding a claimant's failure to follow prescribed treatment may then be made by considering the following questions:

1.  Would the prescribed treatment, if followed, be expected to restore the individual's ability to engage in substantial gainful activity?

2.  Does the individual have good cause for not following the prescribed treatment?

See S.S.R. 18-3p(C). "When considering noncompliance, an ALJ must apply SSR 18-3p unless the ALJ considers noncompliance as part of a credibility determination." *Henson v. Commissioner of Social Security,* 2021 WL 8776794, at *4 (N.D. Tex. 2021), *report and recommendation adopted*, 2022 WL 2078211 (N.D. Tex. 2022) (citing *Mitchell v. Colvin*, 2013 WL 4546729, at *7 (N.D. Tex. 2013)).

---

[4] Social Security Program Operations Manual System.

The law does not permit consideration of noncompliance with treatment as part of the residual functional capacity evaluation. *Henson,* 2021 WL 8776794, at *5.

The ALJ considered all of Lanier's impairments, including polysubstance abuse, and found that she has the residual functional capacity to perform a limited range of light work. ECF No. 13-1 at 23. Because the ALJ did not find that Lanier is "otherwise entitled to disability," however, the policy relating to a claimant's failure to follow prescribed treatment does not apply. *Compare Henson,* 2021 WL 8776794, at * 3 ("Issues concerning SSR 18-3p usually arise in the context of explicit noncompliance determinations. By its terms, this occurs at step five, after a claimant has been found disabled, or at step three, if the claimant's conditions meet or medically equal a condition in the Listing."). Therefore, noncompliance should not have been considered.

Nevertheless, the ALJ referred to Lanier's noncompliance with treatment, as well as her substance abuse, in determining her residual functional capacity, throughout his opinion:

> While the claimant reported memory issues due to the medications she took at hearing, the record shows the claimant's short and long term memory was consistently intact. However, the claimant has an extensive history of polysubstance abuse and non-compliance with medications, which have resulted in multiple hospitalizations. Despite her consistently intact memory throughout the period under consideration, when the claimant is non-compliant with medication and/or using substances, she has moderate limitations in understanding, remembering or applying information.

ECF No. 13-1 at 21.

27

> There are no reports of altercations between the claimant and others. Despite these findings, when the claimant is non-compliant with medication and/or using substances, she has moderate limitations with interacting with others due to impulsiveness and hallucinations.

ECF No. 13-1 at 22.

> While the claimant has mental impairments, when she is compliant with her medications and abstains from substance use, she is stable, happy, and able to work. In January 2021, the claimant stated: "My life is going really good."

ECF No. 13-1 at 29.

The court in *Henson,* 2021 WL 8776794, at *3-*4, discussed the same situation presented in this case:

> Because RFC determinations are based on "the totality of the evidence," ALJs must consider all germane evidence when reaching their RFC conclusion. *See* 20 C.F.R. §§ 404.1545; 404.1560. The Court's job is not to peer over their shoulder and scrutinize how or why they considered noncompliance, but simply to ask two questions: (1) did they follow correct legal standards; and (2) does substantial evidence in the record support their conclusion, however reached? *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382. While ALJs may consider a claimant's noncompliance with treatment, they can only determine noncompliance after they find a claimant is disabled, which typically occurs at step five, or in cases where a claimant's conditions meet those set in 20 C.F.R. pt. 404, Subpt. P, app. 1, at step three.

Here, the ALJ explicitly found that Lanier had not taken her medications consistently and considered Lanier's noncompliance with prescribed treatment as part of the residual functional capacity assessment, rather than as part of the credibility assessment.[5] ECF No. 13-1 at 21, the ALJ stated:

---

[5] "[I]f the ALJ considers the plaintiff's noncompliance merely in assessing the credibility of his subjective complaints, then the requirements of SSR [18-3p] are inapplicable." *Donald*

28

> While the claimant reported memory issues due to the medications she took at hearing, the record shows the claimant's short and long term memory was consistently intact.    However, the claimant has an extensive history of polysubstance abuse and non-compliance with medications, which have resulted in multiple hospitalizations. (Exhibits B11F126-129, B11F100-103, B11F87-89, B11F56-57, and B21F8).

> Despite her consistently intact memory throughout the period under consideration, when the claimant is non-compliant with medication and/or using substances, she has moderate limitations in understanding, remembering or applying information.  In interacting with others, the claimant has a moderate limitation. . . .

> Despite these findings, when the claimant is non-compliant with medication and/or using substances, she has moderate limitations with interacting with others due to impulsiveness and hallucinations.

ECF 13-1 at 21-22.

> While the claimant has mental impairments, when she is compliant with her medications and abstains from substance use, she is stable, happy, and able to work. (Exhibit B18F18-20).

ECF No. 13-1 at 29.

Accordingly, the ALJ erred in considering Lanier's failure to follow prescribed treatment when he assessed her residual functional capacity without following the procedural safeguards in SSR 18-3p.  And the error clearly prejudiced Lanier.  Therefore, the case should be remanded for further proceedings.  *Compare Henson,* 2021 WL 8776794 at *6; *Simmons,* 2018 WL 3900912, at *5 .

---

*W. v. Kijakazi,* 2024 WL 1076838, at *7 (N.D. Tex. 2024), *report and recommendation adopted,* 2024 WL 1008533 (N.D. Tex. 2024) (citing *Simmons v. Berryhill,* 2018 WL 3900912, at *4 (N.D. Tex. 2018), *report and recommendation adopted,* 2018 WL 3873664 (N.D. Tex. 2018)).

Moreover, the ALJ failed to consider whether Lanier had good cause for her noncompliance. *See* 20 C.F.R. § 404.1530(c) (acceptable reasons for failure to follow prescribed treatment). For instance, the record shows that Lanier was homeless during much of the relevant period, and that her medications were often stolen (even when she was living at home). Likewise, "[m]ental limitations are considered when determining if there is an acceptable reason for failing to follow prescribed treatment. 20 C.F.R. § 404.1530(c). Non-compliance that is a result of a mental impairment may constitute an acceptable reason."[6] *Ginn v. Saul*, 2020 WL 7890734, at *10 (E.D. La. 2020), *report and recommendation adopted,* 2021 WL 40185 (E.D. La. 2021) (citing *A.E.S. v. Social Security Administration*, 2019 WL 4744677, at *7 (W.D. La. 2019), *report and recommendation adopted*, 2019 WL 4748023 (W.D. La. 2019)). An inability to "understand the consequences of

---

[6] "[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the "result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) "[T]he ALJ failed to make the critical distinction between Pate–Fires's awareness of the need to take her medication and the question whether her noncompliance with her medication was a medically-determinable symptom of her mental illness."); *see also Kangail v. Barnhart,* 454 F.3d 627, 629-30 (7th Cir. 2006) ("[I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease, . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."); *LeDoux v. Colvin,* 2015 WL 5636414, at *10 (M.D. La. 2015), *report and recommendation adopted,* 2015 WL 5634585 (M.D. La. 2015) ("On remand, the ALJ should consider whether Plaintiff's noncompliance with prescribed treatment results from her mental impairment."); *Brashears v. Apfel,* 73 F. Supp. 2d 648, 650–52 (W.D. La.1999) (remanding case for consideration of whether the claimant's noncompliance with prescribed treatment for her paranoid schizophrenia was excusable due to a mental impairment).

failing to follow prescribed treatment" constitutes good cause for noncompliance. SSR 18-3p, 2018 WL 4945641, at *5.

Finally, the ALJ did not properly consider Lanier's ability to maintain employment. Mental health difficulties, particularly when combined with substance abuse, may intermittently impede a claimant's ability to maintain employment. *See Singletary*, 798 F. 2d at 823 (holding that a person qualifies as disabled if he cannot sustain a job for a significant period of time, even if he is sometimes capable of working for short periods); *see also Hamilton v. Astrue,* 2010 WL 3075761, at *6 (W.D. La. 2010), *report and recommendation adopted,* 2010 WL 3118311 (W.D. La. 2010) ("Bipolar disorders are episodic."). On this point, *Singletary* is instructive. In that case, a claimant was diagnosed with serious, long-term mental health disorders – schizophrenia, various psychoses, delusions, antisocial personality, inadequate personality, passive aggressive personality – as well as polysubstance abuse disorder. The court reasoned as follows:

> When viewed as a whole, Singletary's history presents the picture of an individual living a tragic, chaotic personal life who has been unable to remain employed for more than limited periods of time. He has been hospitalized repeatedly over a long period of time for psychiatric problems, and the record is replete with discussions of his inappropriate behavior and poor social adjustment. Based on such a record, we are not satisfied that substantial evidence supports a determination that Singletary could obtain *and maintain* employment, or that this was the finding of the ALJ.

*Singletary*, 798 F. 2d at 823.  Here, as in *Singletary,* the ALJ did not find, and substantial evidence does not support a determination, that Lanier could or now can obtain *and maintain* employment.

Because the ALJ did not apply the correct legal analyses and procedures for considering Lanier's noncompliance with prescribed treatment and her DAA, and did not properly evaluate her ability to maintain employment, the final decision of the Commissioner should be vacated.

## C.    The    ALJ's    residual    functional    capacity    assessment

Finally, Lanier contends the ALJ failed to resolve the inconsistencies between his rejection of the state agency medical consultants' opinions and his own findings as to Lanier's residual functional capacity.  The ALJ found that Lanier's medical records subsequent to the state agency medical consultants' 2021 opinions showed Lanier's impairments (specifically, polysubstance abuse) were more functionally limiting than the medical consultants had believed.[7]  In other words, the ALJ found

---

[7] The consultants found Lanier's impairments limited her to "medium exertional work and resulted in mild limitations in understanding, remembering, and applying information, moderate limitations in interacting with others, mild limitations in concentration, persistence, or maintaining pace, and moderate limitations in adapting or managing oneself. The claimant would have significant difficulty dealing with the public but could relate to the public on a limited basis, and coworkers and supervisors in non-confrontational situations. The claimant could accept respectful supervision and constructive criticism. She could independently maintain appropriate hygiene and dress." ECF No. 13-1 at 30.

that Lanier is more functionally limited than the onsultants had concluded.

However, the ALJ did not actually assign more severe limitations than the psychology consultant.[8] Dr. Pinkston found Lanier is: moderately limited in her ability to interact appropriately with the general public; moderately limited in her ability to respond appropriately to changes in the work setting; mildly limited in her ability to understand, remember, or apply information; moderately limited in her ability to interact with others; mildly limited in her ability to concentrate, persist, or maintain pace; a moderately limited in her ability to adapt or manage herself; and mildly to moderately impairment in global and work-related functioning (aside from her drug addiction). ECF No. 13-1 at 134-35. But the ALJ found Lanier: has a moderate limitation in understanding, remembering, or applying information; has moderate limitation in understanding, remembering, or applying information when she is non-compliant with medications and/or "using substances"; has a moderate limitation in interacting with others; has moderate limitations with interacting with others due to impulsiveness and hallucinations when she is non-compliant with medication and/or "using substances"; has a moderate limitation in concentrating, persisting, or maintaining pace; and has a moderate limitation in adapting or managing herself. ECF NO. 13-1 at 21-22. Essentially, the ALJ decided that

_____

[8] Dr. Wilson found Lanier can do medium work, while the ALJ found she can only do a limited range of light work.

33

Lanier is more functionally limited by her polysubstance abuse and noncompliance with medication than by her mental illnesses.

Again, however, Lanier's residual functional capacity must be reassessed using the correct procedures regarding noncompliance with prescribed treatment, and giving adequate consideration to her mental illnesses.

III.   **Conclusion**

Based on the foregoing, IT IS RECOMMENDED that Lanier's appeal be GRANTED, that the final decision of the Commissioner be VACATED, and that the case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ.

P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ___30th___ day of August 2024.

_____
Joseph H.L. Perez-Montes
United States Magistrate Judge